Filed 9/10/15  P.F. v. Super. Ct. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| P.F., | |
| Petitioner, | E063741 |
| v. | (Super.Ct.No. J249238) |
| THE SUPERIOR COURT OF SAN BERNARDINO COUNTY, | OPINION |
| Respondent; | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Cheryl C. Kersey, Judge.  Petition denied.

Bethanie L. Fanti for Petitioner.

No appearance for Respondent.

Jean-Rene Basle, County Counsel, Dawn M. Messer, Deputy County Counsel, for Real Party in Interest.

Rich Pfeiffer for minor, T.L.

Petitioner P.F. (father) filed a petition for extraordinary writ pursuant to California Rules of Court, rule 8.452 (rule 8.452), challenging the juvenile court's order terminating reunification services as to his child, T.L. (the child) and setting a Welfare and Institutions Code[1] section 366.26 hearing. Father contends the court erred in not returning the child to his custody or, in the alternative, in denying him additional reunification services. We deny the writ petition.[2]

FACTUAL AND PROCEDURAL BACKGROUND

On May 2, 2013, San Bernardino County Children and Family Services (CFS) filed a section 300 petition on behalf of the child, who was a few days old at the time.[3] The petition alleged that the child came within the provisions of

---

[1] All further statutory references will be to the Welfare and Institutions Code, unless otherwise noted.

[2] The child's mother (mother) is not a party to this writ.

[3] Father previously filed a notice of intent to file a writ petition (case No. E061719). However, this court dismissed the petition for failure to timely file a petition. Mother subsequently filed a notice of appeal (case No. E062267). This court dismissed that case as abandoned, pursuant to *In re Sade C.* (1996) 13 Cal.4th 952. We take judicial notice of the records in case No. E061719 and case No. E062267. (Evid. Code, § 452, subd. (d).)

2

section 300, subdivisions (b) (failure to protect), (g) (failure to support), and (j) (abuse of sibling).

The social worker filed a detention report and stated that CFS received a referral stating that mother and the child were both positive for methamphetamine at the child's birth. The child suffered withdrawal symptoms and was a poor feeder. The social worker reported that mother had a substance abuse history and had three dependency cases, regarding three of her other children. Mother believed that A.L., the father of her other daughter, was the child's father.

The court held a detention hearing on May 3, 2013, and detained the child in the hospital. She was to be placed in an appropriate foster home when released.

*Jurisdiction/Disposition*

The social worker filed a jurisdiction/disposition report dated May 24, 2013, and recommended that the court declare the child a dependent of the court and that reunification services be provided to mother, but not to the alleged fathers. The social worker reported that mother initially stated that the child's father was A.L., but then disclosed that father may be the child's father. Neither was on the child's birth certificate. The social worker submitted an absent parent search for father.

The May 24, 2013 jurisdiction/disposition hearing was continued to allow CFS to complete notice to the alleged fathers. At the July 30, 2013 further

jurisdiction/disposition hearing, the court sustained the petition, declared the child a dependent, and granted mother reunifications services. The court found that the alleged fathers were not entitled to services.

*Six-month Status Review*

The social worker filed a six-month status review report and recommended returning the child to mother under a family maintenance plan. Mother had completed classes, drug tested negative, and attended substance abuse meetings. Father's whereabouts were still unknown. At the six-month review hearing on January 30, 2014, the court ordered the child returned to mother's care under a family maintenance plan.

*Section 387 Supplemental Petition and Jurisdiction/Disposition*

Mother was arrested for possession of methamphetamines and child endangerment, when the police pulled her over for reckless driving. Thereafter, the child was placed in a foster home. The social worker filed a section 387 supplemental petition on July 25, 2014.

The court held a hearing on the section 387 petition on July 28, 2014, and detained the child.

The social worker filed a jurisdiction/disposition report dated August 18, 2014, and recommended that no reunification services be provided to mother.

The court held a jurisdiction/disposition hearing on August 18, 2014, and father appeared. The court ordered a paternity test and stayed visitation, pending

4

the results of the test. The court denied reunification services to mother and set a section 366.26 hearing.

Mother subsequently filed a section 388 petition, which the court denied.

On October 22, 2014, CFS filed the paternity test result with the court. The results indicated the probability of paternity was 99.99 percent.

*Section 388 Petition*

On October 30, 2014, father filed a section 388 petition, asking for the court to return the child to him under family maintenance, or alternatively, provide him with reunification services. Father alleged that he was a partner in a thriving real estate business, he owned a restaurant/bar in New York, and he could provide a secure and stable home.

The social worker filed a response to father's section 388 petition and recommended that father be provided with services. The social worker reported that he interviewed father on November 6, 2014. Father explained that he did not know that the child existed until she was six months old. Mother reported that she started receiving $200 to $300 a month from father to help support the child. When asked why he wanted custody of the child, father said he believed he would be a good father and said he had two other children, ages 17 and 20. Father reported that he owned two restaurants in New York with his brother. The social worker checked the internet for both restaurants. The internet showed that one of the restaurants was closed. When the social worker called father to ask about it, father said the restaurant was under renovation for 60 days. The

5

social worker could not find the other restaurant on the internet. When asked about that one, father said the name of the restaurant changed about one year ago. When asked why he was unaware of the name change, father said his brother ran both restaurants. The social worker asked for his brother's cell phone number. Father said he did not have it, and he would have to get it from his sister.

Father reported that he used to drink alcohol and was in a treatment center in Ohio 10 years ago. He said he entered the program because he had a conviction for driving under the influence. He was in the program for one month. He also said he entered a residential treatment program for alcohol dependency in Los Angeles, but did not say when. He denied any current substance abuse, but said he attended recovery meetings in Los Angeles. The social worker questioned the validity of father's answers. Father said he was in outpatient treatment in Ohio 10 years ago, but also said he had been working for a real estate company in Los Angeles for 16 years. The social worker also doubted whether father had business connections with his brother in New York, since he could not provide his brother's phone number.

The social worker contacted another social worker, Natalie Lopez, who had facilitated a visit between father and the child on November 6, 2014. Lopez reported that father seemed to have difficulty with the child, in that he did not know how to approach her or respond to her. So, he gave her some space and allowed her to initiate with him. Toward the end of the visit, father was interacting more with her.

The social worker recommended services for father, including the requirements that he complete a parenting education class, participate in a 12-step program, and submit to random drug testing. The case plan clearly stated that if he failed to show up for a drug test, it would be considered a dirty test.

The court held a hearing on the section 388 petition on November 18, 2014. The court deemed father the biological father of the child. The court agreed with CFS's recommendation to offer father services. The court noted there was some disagreement between the parties as to whether or not it was giving father services "under a .21(e) or keeping the [child] in PPLA [Permanent Planned Living Arrangement] for an additional six months, and his services [would] be offered under PPLA." The court heard argument from counsel on the matter. Father's counsel argued that father should be given services under section 366.21, subdivision (e), since this was his first opportunity to have services. County counsel asserted that, in terms of time frames, they were basically at the 18-month mark, and the court's decision to call the next hearing a permanency placement review hearing would be "a reasonable accommodation in this case." County counsel said there was some trouble locating father, and that the address listed on the due diligence report was a business address, which was also the same address father listed on his section 388 petition. The court noted that it did appear that father "may be engaged in business that [was] not exactly legal or aboveboard." Nonetheless, the court granted him services. The court placed the child in a PPLA and stated that if father failed to reunify within

the next six months, or "show some kind of substantial probability reunification," the section 366.26 hearing would be reset. The court further advised father that if the child could not be returned by the next review, his parental rights may be terminated, pursuant to section 366.26. The court granted father's section 388 petition and ordered him to participate in reunification services. It ordered visitation to be one time a week for two hours.

*Status Review Report*

The social worker filed a status review report dated May 15, 2015, recommending that father continue to receive services under the child's PPLA. Father had completed three parenting classes. He was also participating in 12-step meetings almost daily. He tested negative for drugs on five occasions. However, he failed to show up for testing on five other dates. He was unavailable on one of those dates because his mother had a stroke. On December 19, 2014, father reported to the social worker that he relocated to a new residence in Hollywood, California. He further reported that he had visited mother, and she wanted to get back together with him. Father said he wanted to get back together with her "if she [did] what she is supposed to do." Then, in April 2015, the social worker received information that father's business partner/roommate was shot behind their apartment.

The social worker reported that visits with the child were going well, except father failed to show up for his scheduled visit on April 1, 2015. It was also reported that sometimes father and mother would go to the visits and other

times they would not. It was additionally reported that sometimes they stayed for the entire visit, and other times they left early.

The social worker further reported that the child was moved into her current foster home on January 23, 2015. The current caregivers had expressed an interest in adopting the child, if reunification efforts failed. The child's great aunt had also expressed an interest in adopting her and was currently being assessed.

The court held a permanent plan review hearing on May 15, 2015. The child's counsel set the matter contested. County counsel reminded the court that father had already had six months of services under the PPLA, which was the statutory limit since it was "not a reunification case." Father's counsel noted that father had completed a parenting program and was participating in Narcotics Anonymous/Alcoholics Anonymous meetings, and he was asking for return of the child. The child's counsel then informed the court that father's drug test results on April 20, 2015, were abnormal, and "it indicate[d] it was diluted." The court ordered father to test that day and informed that if he refused or failed to test, it would count as a positive test result. The court set a trial date for June 9, 2015. Father did drug test that day, and the results were negative.

The court held a permanent plan review hearing on June 9, 2015. County counsel informed the court that the child's current caregiver was willing to provide a permanent home for the child. The court indicated its intent to discontinue father's services and set a section 366.26 hearing. Father's counsel

9

argued that visits with the child had gone well, and that there was no indication that father could not benefit if the court "continue[d] to offer him a little bit more time." Father's counsel acknowledged the court's concerns that father had not tested consistently; however, she argued that one time, father was referred to a testing site that was no longer available, and another time, he was away visiting his mother, who had had a stroke. She also said that father denied that he left visits early or that he and mother were visiting the child together. Father's counsel asked the court to continue to offer services to him, and, for the first time, suggested that counseling be added to his case plan. The court noted that father was arguing that the child should be in PPLA status without any time limit because he still wanted to visit the child or go to counseling. However, the court stated those were not reasons to deny permanency to the child. The court stated that services under a PPLA were not indefinite, and that father was advised he would receive only six months of services. The court then found that father failed to participate regularly and make substantive progress in his case plan. It stated that there was not a substantial probability that the child could be returned to the parents within the statutory time frame. The court also found that the likely date for adoption, guardianship, placement with a relative, or identified placement was within six months. It then terminated reunification services and set a section 366.26 hearing to make a permanent plan for the child.

10

ANALYSIS

The Court Properly Terminated Father's Services and Set a Section 366.26

Hearing

At the outset, we note that father makes many and varied assertions, in a somewhat confusing manner.  Ultimately, he claims that the juvenile court erred in failing to return the child to his custody.  In the alternative, he contends that the court should have extended his reunification services for six more months to allow him time to participate in counseling.  We find no error.

A.  *Father Has Failed to Demonstrate That the Court Erred in Not Returning the Child to His Custody*

Father asserts that the court erred in not returning the child to him.  He first claims that the court erred in using the best interest of the child standard in terminating his services, when it should have based its decision on whether he had made substantial progress in his services.  Contrary to father's claim, the court expressly found that he failed to participate regularly and make substantive progress in his case plan when it terminated his services and set a section 366.26 hearing.

Father then argues that the court should have returned the child to his custody because he completed his case plan and he had not missed any visits with the child.  Father's case plan included the requirements that he complete a parenting education course, participate in a 12-step program, and submit to random drug testing.  His written case plan clearly stated that if he failed to show

11

up for a drug test, it would be considered a dirty test. The record shows that father was a no show for drug testing on November 24, 2014, December 11, 2014, December 16, 2014, January 20, 2015, and April 24, 2015. In his writ petition, father claims that, for the dates he missed, he had not yet received a referral for testing. However, the record shows that he tested negative for drugs five times on various dates between January 14, 2015 and April 20, 2015. In other words, his contention rings false, since he had already been tested during the time frame he did not show up. In any event, contrary to father's claim, he did not complete his case plan. Although he did complete a parenting class and was attending 12-step meetings, the record reflects that he had five positive drug tests.

Furthermore, the record belies father's claim that he had not missed a visit since he was granted visitation in November 2014. The evidence indicated that he was inconsistent in his visits and specifically stated that he failed to show up for his scheduled visit on April 1, 2015. It also showed that sometimes he visited and sometimes he did not. When he did come, he would sometimes leave the visits early.

Father curiously also asserts that the only case plan requirement he had not complied with was counseling. At the same time, he acknowledges that his case plan did not include a counseling requirement. To the extent father is arguing that the court erred in finding he had not completed his case plan because

12

he did not complete any counseling, we note that the court never mentioned any requirement of counseling. Thus, it is unclear why father raised this issue.

Father then argues that "if the Court adopts the standard of review of a post permanency review hearing, [his] reunification services should not be terminated because it is not in the best interests of the Minor." Father cites no legal authority in support of this claim; thus, it is difficult to discern exactly what he is arguing, especially since he earlier argued that the court "errored [*sic*] in determining the standard to use was the best interest of the child." In any event, whether he is contending that the court had to find that he failed to make substantive progress in his case plan, or find that it was not in the child's best interests to return her to father's custody, his claim fails. As discussed *ante*, the evidence supported a finding that he failed to make substantive progress in his case plan. As to best interests of the child, father asserts that it was in the child's best interests to be returned to him simply because he had "been involved in [her] life since November 2014 and no concerns were noted." He further asserts that the child "has adjusted to the visits and is comfortable [with him], and to change that now would not be in the best interests of [the child]." The record did not demonstrate that father and the child were bonded in any way. He had never lived with her and had only visited with her for about six months. When he first visited her, he did not know how to approach her, and he did not interact with her until the end of the visit. Since then, the visits went well, and his interactions with her were positive. However, the record shows that father had scheduled

visits with the child only one time a week for two hours, and he was inconsistent in making those visits. Even when he did visit, he did not always stay the entire time. In contrast, by the time of the hearing on June 9, 2015, the child had lived in her current placement for approximately six months and was doing well. The current caregivers were willing and able to provide care for the child, and they had expressed an interest in adopting her. In light of all the evidence, we cannot say that it was in the best interests of the child to return her to father's custody.

Furthermore, we note that, although father is now claiming that the court erred in not returning the child to his custody, he did not even seek return of the child at the June 9, 2015 hearing. Rather, father repeatedly asked the court to offer him "a little bit more time."

In sum, father has failed to show that the court erred in not returning the child to his custody, since he had not completed his case plan, and it was not in the child's best interest.

B. *Father Was Only Entitled to Six Months of Services*

In the alternative, father argues that the court erred in denying him additional reunification services because there was a substantial probability of return within six months. He also asserts that the court erred in denying additional services because substantial evidence did not support a finding that he received reasonable reunification services. Both of these arguments are baseless because father was only entitled to six months of services. Section 366.3, subdivision (d), provides in part: "If the child . . . is in a placement other than the

14

home of a legal guardian and jurisdiction has not been dismissed, the status of the child shall be reviewed at least every six months." Section 366.3, subdivision (f), provides: "Unless their parental rights have been permanently terminated, the parent or parents of the child are entitled to receive notice of, and participate in, those hearings. It shall be presumed that continued care is in the best interests of the child, unless the parent or parents prove, by a preponderance of the evidence, that further efforts at reunification are the best alternative for the child. In those cases, the court may order that further reunification services to return the child to a safe home environment be provided to the parent or parents *up to a period of six months . . . ."* (Italics added.)

Here, father was not a part of the original detention since he did not know about the child's existence until she was six months old. By the time father established paternity, the court had already denied mother reunification services and set a section 366.26 hearing. Father filed a section 388 petition, requesting reunification services. The court vacated the section 366.26 hearing, placed the child in a PPLA, and granted father's section 388 petition. At that time, the court expressly told father that if the child could not be returned to him by the next review hearing in six months, a section 366.26 hearing would be reset. The court ordered him to participate in reunification services on November 28, 2014. By the time of the contested permanent plan review hearing on June 9, 2015, father had received over six months of services. The court properly reminded him that

15

he was previously told he would only receive six months of services. Father reached his six-month limit of services under section 366.3, subdivision (f).[4]

Moreover, father fails to make any arguments in support of his apparent claim that he did not receive reasonable reunification services.[5] "'[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration. [Citations.]' [Citations.] This principle is especially true when an appellant makes a general assertion, unsupported by specific argument, regarding insufficiency of evidence. [Citation.]" (*People* v. *Stanley* (1995) 10 Cal.4th 764, 793.)

Furthermore, father appears to only be requesting additional time so he can participate in counseling. At the conclusion of his writ petition, he states: "[I]f the Court wants Father to participate in counseling with Minor[,] then Father requests the Court [to] extend his reunification for six months to allow him time to complete the new case plan." As stated *ante*, counseling was never a requirement of father's case plan.

_____

[4] We note that even if father had been granted services at the start of the dependency, the court would have ordered services for six months, since the child was under the age of three on the date of the initial removal. (§ 361.5, subd. (a)(1)(B).)

[5] We note that counsel for the child filed an opposition to father's writ petition, arguing that father received reasonable services under the circumstances.

## DISPOSITION

The writ petition is denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST
Acting P. J.

We concur:

McKINSTER
J.

CODRINGTON
J.

17